## Case No. 7,690.

### KENDALL v. ALMY et al.

### [2 Sumn. 278.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1835.

ASSIGNMENT—PERSONAL PROPERTY — MEANING OF —CONTRACT—SPECIFIC PERFORMANCE.

1. An assignment conveyed to the plaintiff "all the goods, wares, merchandises, and personal property of every kind, belonging to the late firm," &c. *Held*, that the words "personal property of every kind," in the foregoing connexion, signify visible, tangible property, ejusdem generis, as goods, &c. and that an interest under a contract would not pass thereby.

[Cited in Andrews v. Schoppe, 84 Me. 175, 24 Atl. 805.]

2. A court of equity will not enforce a specific performance of a contract, as between the original parties, unless its terms are clear, definite, and positive; and a fortiori, where the specific performance is sought against an assignee.

[Cited in Brown v. Brown, 47 Mich. 384, 11 N. W. 299.]

3. A party, to entitle himself to a specific performance of a contract, must show, that he has been always ready to perform his part of it.

[Cited in Almy v. Wilbur, Case No. 256.]

4. "It is further agreed, that if Low & Fenner should redeem their one half of the aforesaid contract, by the payment of the drafts drawn on them by R. Hazard & Co. on account thereof, to return half of the aforesaid $5000 to said S. Almy, he relinquishing to said Low & Fenner all claim upon the aforesaid one half of the said contract." *Held*, that Low & Fenner, in order to derive benefit under the preceding clause, should have proceeded forthwith, or within a reasonable time, to make the redemption specified.

Bill in equity, by Timothy C. Kendall, of the city of Boston, in the district of Massachusetts, and a citizen of the state of Massachusetts [against S. Almy and others]. The substance of the bill was as follows:

On the 3d of March, A. D. 1828, an agreement was made and entered into by and between Christopher Lippitt, of Jewett City, in the Connecticut district, manufacturer, and a citizen of the state of Connecticut of the one part, and Rowland G. Hazard, and Isaac P. Hazard, of South Kingstown, in the Rhode Island district, manufacturers, then in company, under the firm of R. G. Hazard & Co. and both citizens of the state of Rhode Island, &c., of which agreement a copy marked "A" is hereunto annexed, and which your orator prays may be taken as a part of this bill of complaint. That some time after the execution of said agreement, the said R. G. Hazard & Co. entered into an agreement with Charles Low and Cornelius G. Fenner, both of the city of Providence, in said Rhode Island district, there in company, under the firm of Low & Fenner, and both citizens of the state of Rhode Island, &c.; by which agreement the said R. G. Hazard & Co. sold to the said Low & Fenner, one half of their

[1] [Reported by Charles Sumner, Esq.]

interest in the agreement first mentioned, and in the profits to be therefrom realized, and agreed to pay over to said Low & Fenner one half of said profits, as fast as they were received by the said R. G. Hazard & Co., the said Low & Fenner agreeing on their part to advance to the said R. G. Hazard & Co. one half of the money which they were bound to advance by virtue of their said agreement, with said Lippitt, and at such times as the said R. G. Hazard & Co. should need the same; and also to bear one half of the loss (if any) which should accrue to them, the said R. G. Hazard & Co. under said agreement. And in case no profits were realized from the business under said agreement, then the said R. G. Hazard & Co. were to charge the said Low & Fenner no compensation for their attention to and services in the business. And in case a profit should be realized, under the agreement aforesaid, the said R. G. Hazard & Co. were to charge a reasonable compensation for their services in the business, to be agreed upon after the contract with the said Lippitt had expired. It was further agreed between the said R. G. Hazard & Co. and the said Low & Fenner, that the interest of the said Low & Fenner in the agreement between the said Lippitt and R. G. Hazard & Co. and in and to the profits to be therefrom derived, and their liability to pay the losses aforesaid, should commence on and from the date on which said agreement was made and executed, to wit, the 7th day of March, A. D. 1828. That the said R. G. Hazard & Co., in pursuance of their said agreement with said Lippitt assumed on themselves the payment of all the machinery provided for in said agreement, to wit, eight hundred spindles, and preparation therefor: and the said Low & Fenner, advanced to the said R. G. Hazard & Co. one half of all the moneys by the said R. G. Hazard & Co. assumed to be paid for said machinery, and at such times as the said R. G. Hazard & Co. called for the same. That immediately after the said 7th day of March, A. D. 1828, the said R. G. Hazard & Co. began to supply the said Lippitt with cotton under the agreement aforesaid, and to receive and sell the goods manufactured therefrom. That after the said R. G. Hazard & Co. had assumed and paid all the moneys which they were bound to assume and pay by virtue of their said agreement with said Lippitt, and after the said Low & Fenner had advanced to the said R. G. Hazard & Co. all the moneys which they were bound to advance the said R. G. Hazard & Co. as aforesaid, to wit, one half of the whole sum, paid by the said R. G. Hazard & Co., they, the said R. G. Hazard & Co. failed, and on the 30th of May, A. D. 1829, made and executed to Thomas R. Hazard, of South Kingstown aforesaid, manufacturer, and a citizen of the state of Rhode Island, &c. and the said Charles Low, a deed of assignment of all their property, in trust, for the benefit of

the creditors of the said R. G. H. & Co. That said deed of assignment conveyed to said assignees all the right, title and interest of the said R. G. H. & Co. in and to said contract with said Lippitt, and in and to the machinery therein referred to, and in and to all the profits to be derived from said contract, and from supplying said Lippitt with cotton under the same. That the said Low & Fenner, after they had advanced to said R. G. Hazard & Co. all the moneys they were bound to advance them, under, and by virtue of their said agreement with them, to wit, on the 4th day of July, A. D. 1829, failed, and on the same day made and executed to your orator a deed of assignment of all their property, in trust, for the benefit of their creditors. That by said deed of assignment was conveyed to your orator the title to one half of the profits then received, and to be received under the agreement aforesaid by the said R. G. Hazard & Co. or their assigns. That soon after the making and executing of said deed of assignment by the said R. G. Hazard & Co., to wit, on the —— day of ——, A. D. 1829, the said Thomas R. Hazard transferred to Sampson Almy, manufacturer, of said city of Providence, and a citizen of the state of Rhode Island, &c., said contract, and the right to supply said Lippitt with cotton, to be manufactured into goods in conformity to said contract; and to receive the profits arising from the sale of the same,—one half of the profits so by the said Almy received, to be by him accounted for and paid over to your orator as assignee of said Low & Fenner. That the said Almy, at the time he accepted the transfer of said contract, had notice of the interest which your orator, as the assignee of said Low & Fenner, had in said contract, and of your orator's right to receive one half of said profits. That by virtue of said transfer, and ever since the same was made, said Almy has continued to supply said Lippitt with cotton, and has received the goods into which the said cotton was manufactured, and has sold the same, and received the proceeds of the sales, that the profits which have thus been received by said Almy, under and by virtue of said contract, amount to the sum of $12,000, one half of which justly belongs to your orator as assignee of Low & Fenner, and ought to be paid to your orator by said Almy. The bill prayed, that the said Almy be decreed to pay over to the complainant one half of the profits by him received, as aforesaid; also to supply the said Lippitt with cotton under the said contract jointly and equally with the orator, and to receive only one half of the profits thereof, and equally transact the business under the said contract, until the profits are received jointly with the orator, and until the expiration of the said contract. Also, that the said Thomas R. Hazard may be forever enjoined from setting up any title or claim to that part of the profits under the said contract,

which was conveyed to the said Low & Fenner, and by them to the orator; or from doing any act which shall in any manner obstruct the orator in the receipt and enjoyment of all the benefits and profits under and by virtue of the said contract, to which the orator, as assignee of the said Low & Fenner, is entitled. The bill concluded with a prayer for general relief.

The Lippitt contract, which was made a part of the bill, was as follows: "This agreement, made and entered into between Christopher Lippitt, of Jewett City, Connecticut, of the one part, and R. G. Hazard & Co. of Providence, Rhode Island, of the other part, witnesseth: That the said Hazard & Co. do hereby agree, to assume the payments of certain parcels of machinery, amounting to five hundred spindles and preparation, now purchased or contracted for by said Lippitt; and also for three hundred spindles and preparation, to be hereafter contracted for by him, the said Lippitt, they receiving bills of sale of the same as security for the amount advanced, the amount not exceeding $10,000. And the said Lippitt, on his part, agrees to run the said machinery in his factory at Jewett City, for the benefit of the contracting parties, in manufacturing cotton into 4-4 brown sheetings, the yarns to be spun from No. 16 to No. 18, well woven and well manufactured in all respects, and pay all proper and necessary attention to the business at said mill, to receive the cotton in Providence, and deliver the goods there, for and in consideration of which, he is to receive three and one half cents cash per yard, which is to be in full for the manufacturing of said goods. And the said Hazard & Co. further agree to pay all proper and necessary attention to purchasing the stock, disposing of the goods, negotiating drafts, and any and all other business which it may be requisite for them to attend to in Providence, and charge nothing for the same, unless they should guarantee sales; in that case the usual guarantee commission is to be allowed them. It is further agreed, that the profits, arising from said business, shall be equally divided between the contracting parties. This agreement to commence immediately, and continue until the 25th day of March, 1830; and if, at that time the said Lippitt's part or one half of the profits, with the interest thereon, which are to be applied to the payment of the money advanced, should not be sufficient to pay said advance, he is then to be at liberty to continue until it shall be paid for in this way, or to have the privilege of paying the deficit with the interest, from that time, in two years from the termination of this contract. It is also understood, that interest at the rate of six per cent. per annum, is to be allowed on all amounts received, or paid by either of the contracting parties (except the advance on account of the purchase of machinery), from the time at which it was received, or paid, to the time of settlement.

which is to be semi-annually, and on all balances then due, to the time of final settlement. The account with the factory, in consequence of this agreement, is to be kept with the Griswold Factory, and all just charges against said factory to be as binding on the contracting parties, as if entered in their names. It is understood, that the machinery, mentioned in the foregoing instrument, is only to be holden by the said Hazard & Co. as collateral security for the money advanced, and that it is to be given up to said Lippitt on his refunding the said advance, until which time the said Lippitt hereby agrees to keep it insured."

The separate and several answer of Sampson Almy, one of the defendants, was in substance as follows:

That he believes, that the said Christopher Lippitt and the said Rowland G. Hazard and Company, did on the 7th day of March, A. D. 1828, sign and execute the contract marked "A," a copy of which is annexed to the complainant's bill. That whether the said firm of Low and Fenner, had any interest or concern in said contract. and if any, what, and when or how acquired, this defendant has no knowledge, except from the declarations of the said Low and Fenner, and the said Rowland G. Hazard, as hereinafter stated. Nor does this defendant know, whether the said Low and Fenner advanced any money to the said Lippitt, or to the said Rowland G. Hazard and Company, on account of said contract, except as hereafter stated. This defendant admits the failure and assignment of the said Rowland G. Hazard and Company, as set forth in said bill, but whether said assignment, conveyed the interest of the said Rowland G. Hazard and Company, in and to said contract with the said Lippitt, and in and to said machinery, is a legal question which the defendant submits to the decision of this honorable court. This defendant has been informed and believes, that the said Lippitt, at the time of said assignment of the said Rowland G. Hazard and Company, lived in the state of Connecticut, and the said machinery was also then in the mill of said Lippitt, in said state. and that by the law of the state of Connecticut, no assignment of an insolvent debtor, giving a preference of one creditor over another, is valid as to property in the state. This defendant admits, that he made a contract with the said Rowland G. Hazard, in relation to supplying said mill with cotton, but denies, that by said contract, he agreed to pay. or was bound to pay any part of the profits of the said mill, to the said complainant. All that this defendant now recollects, concerning said contract, is, that some time before the failure of Low and Fenner, which he thinks took place on the 4th of July, 1829, the said Rowland G. Hazard called on this defendant. and stated that R. G. Hazard and Company, had made a contract with Christopher Lippitt, of Jewett City, in the state of Connecticut, for manufacturing cotton sheetings, and that Charles Low or Low and Fenner, were interested in said contract, but had refused to go on with it and furnish the cotton, fearing that they might lose by the business. The cotton business, at that time, was considered by many as a very precarious business. The said Hazard asked this defendant if he would supply said Lippitt with cotton, under said contract, and if so, upon what terms. After several conversations on the subject, this defendant agreed to go on and execute the contract, on condition that this defendant should have the profits of one half of the mill, for his trouble and risk, the loss, if any, to fall entirely upon him. The said Rowland G. Hazard and this defendant, then conversed with the said Charles Low, in the presence of the said Fenner, both of whom expressed their satisfaction with the arrangement. Hazard and Low agreed to give this defendant reasonable notice, in case of any change in the arrangement then made. Said agreement with this defendant was minutely stated, and this defendant believes was fully understood by the said Hazard, and the said Low and Fenner. Whether the said Low acted as one of the assignees of the said Rowland G. Hazard and Company, or for the said Low and Fenner, or for both in making said contract, this defendant does not know. But he does know, that in several of the conversations on the subject, the said Rowland G. Hazard stated, that the said Low and Fenner were equally interested with the said Rowland G. Hazard and Company, in said Lippitt contract, which Low and Fenner denied, and stated that they never had any interest of any kind, in said contract.

This defendant proceeded to execute said contract with said Lippitt, in conformity with his agreement with Rowland G. Hazard, who acted as the agent of the assignees of the said Rowland G. Hazard and Company, and was fully empowered so to act, as this defendant believes. He purchased cotton, and made sales of the cloth, and paid other expenses, as by the accounts hereunto annexed, marked "A," will appear, and this defendant has no other knowledge or means of knowledge, of the persons of whom he made purchases of cotton and other articles, of the persons by whom the sales of the cloth were made, the prices, times of sales and purchase, and the ultimate amount of profit, than what appears by the papers last referred to. On the 9th of March, 1830, this defendant purchased of the said Rowland G. Hazard, as agent of the said assignees, all the interest which the said Rowland G. Hazard and Company, and the said assignees had in and to said Lippitt contract, and said machinery, by a written contract of sale of that date, a copy of which

marked "B" is hereto annexed. The question, whether Low and Fenner ever had any interest in said Lippitt contract was still undecided, the said Rowland G. Hazard wishing to establish the affirmative, and so declaring the fact to be, and the said Low and Fenner denying it. Some months after this written contract, the said Rowland G. Hazard informed this defendant, that he had settled the disputed question, concerning Low and Fenner's interest in the Lippitt contract, and had allowed them the sum of twenty-seven hundred dollars, which was to settle all their claims upon the Lippitt contract and machinery, and that as that question was settled, this defendant might consider himself as the sole owner of said Lippitt contract and machinery, for the sum of five thousand dollars, which this defendant then agreed to, and from that time, did consider himself sole owner. The said Charles Low had, previously to said written contract, offered this defendant said machinery and Lippitt contract for said sum of five thousand dollars. In the contract for the purchase of this machinery and Lippitt contract, by this defendant, for the sum of five thousand dollars, no mode of payment was ever agreed upon by this defendant, and the said Rowland G. Hazard. This defendant had a claim of about four thousand dollars upon the said Rowland G. Hazard & Co. which was among the preferred claims in their assignment, and it was probably expected by the said Rowland G. Hazard, and was expected by this defendant at the time, that that claim should be settled and adjusted when the five thousand dollars was paid (though this defendant has no recollection that it was so stated at the time.) This defendant has often expressed his wish to have a settlement of all debts and claims existing between himself and the said Rowland G. Hazard & Co.; such a settlement has never yet been made. This defendant continued to furnish said Lippitt with cotton under said contract, from the time of the verbal agreement between this defendant and the assignees of the said Rowland G. Hazard & Co., up to the 11th day of September, 1832, after which the said Lippitt did not send for any more, giving as a reason, that the said Low & Fenner, or Charles Low, forbade his receiving it of this defendant. From the time of the verbal contract of July, 1829, to some time in the latter part of the year 1832, or beginning of 1833, as this defendant thinks, neither the said Low or Fenner, ever intimated to this defendant, that they claimed any interest in said Lippitt contract; neither of them ever furnished, or offered their proportion of the cotton for said mill, nor to pay any part of the other expenses; nor did either of them say or do any thing, that would have subjected them to any loss in case such had been the result of the business. On the contrary, this defendant believes,

that the said Low & Fenner did sell to the said Rowland G. Hazard, as agent of said assignees, all their interest in said Lippitt contract, and abandon all claim to the same, which this defendant avers to be the fact, and denies that the said Low & Fenner, or their assignee, the complainant, has any interest in the said Lippitt contract, or in said machinery. The said Charles Low acted as the agent of the complainant in all the business of Low & Fenner, as this defendant has been informed and believes; and in all the conversations and contracts with the said Rowland G. Hazard, before stated, this defendant understood, that the said Rowland was acting as the agent of the assignee of Rowland G. Hazard & Co. This defendant further states, that on the 18th of August, 1831, he paid William Field the sum of five hundred and fifty dollars for a double speeder for said mill, the same being necessary, as he believes, to the successful operation of said machinery, and which speeder is now in said mill, and forms a part of the machinery thereof, and he claims an allowance of the same, out of the balance of the profits in his hands, or in such other way as this court may deem equitable, in the event of their deciding, that the plaintiffs, or the said Low & Fenner have any interest in said contract, or in said machinery, which this defendant again denies, and prays the court to adjudge accordingly.

The separate and several answer of Thomas R. Hazard, one of the defendants, was in substance as follows: That he believes that the said Christopher Lippitt and the said Rowland G. Hazard & Co. did sign and execute the contract marked "A," and annexed to the complainant's bill. That he believes, that the said Low & Fenner purchased one half of said contract of the said Rowland G. Hazard, and paid for all, or nearly all, of said half by their acceptances; but as said contract was made before the failure of the said Rowland G. Hazard & Co., this defendant is not particularly informed of the particulars thereof. This defendant admits the failure of the said Rowland G. Hazard & Co., and that he was constituted their assignee as stated in said bill. He admits the failure of the said Low & Fenner, and the appointment of the complainant, their assignee, as stated in said bill. This defendant also admits and states, that he, as assignee of the said Rowland G. Hazard & Co. (not considering himself authorized as to go on and execute said Lippitt contract, by supplying said mill with cotton,) did make a contract with Sampson Almy, some time in the year 1829, to supply said mill with cotton, and that the said Sampson, in pursuance of said contract, did supply said cotton until some time in the year 1830, when said contract was sold to the said Sampson for the sum of five thousand dollars, and that a debt due from him and the said Low, as assignees

of the said Rowland G. Hazard & Co. to the said Sampson, of about five thousand dollars, was to be deducted from said price, and the balance paid to the assignees of Rowland G. Hazard & Co. This defendant further states that he believes, that the said Charles Low assented to said contracts with the said Almy, so as to bind any interest the said Low & Fenner, or their said assignee, ever had in said Lippitt contract. The contracts with the said Almy were principally made by the said Rowland G. Hazard, as agent of this defendant, and therefore, the circumstances were not particularly known to this defendant; but he believes and states, in defence of said bill, that all the interest of the said Low and Fenner in said contract, or of the complainant, was sold to the said Almy by the said Rowland G. Hazard, and with the consent of the said Low & Fenner.

The joint answer of Charles Low and Cornelius G. Fenner, two of the defendants, was in substance as follows: That they admit the making the agreement, mentioned in said bill, and of which a copy is thereunto annexed, marked "A," between the said Christopher Lippitt and R. G. Hazard and J. P. Hazard, doing business under the firm of R. G. Hazard & Co., and, that the said R. G. Hazard & Co. subsequently sold to these defendants, said Low and Fenner, one half of said contract, and one half of all the profits already derived and to be derived therefrom, upon the terms and conditions in said bill stated. These defendants further admit, that their interest in said contract, was to commence at the time stated in said bill, being the 7th day of March, A. D. 1828, which was the date of the contract aforesaid, between said Lippitt and said R. G. Hazard & Co. And these defendants further admit, that the said R. G. Hazard & Co. assumed on themselves, the payment for all the machinery provided for, in said agreement: and these defendants state, that they have also advanced to the said R. G. Hazard & Co., one half of all the moneys by them assumed to be paid for said machinery (or within a trifle of the amount, being as near an' half, as could be ascertained, without a full settlement of all the accounts), and at such times as the said R. G. Hazard & Co. called for the same. These defendants further admit the execution and delivery thereafter, of the deed of assignment, by said R. G. Hazard & Co., to the said Charles Low and Thomas R. Hazard, in trust, for the benefit of the creditors of said R. G. Hazard & Co. at the time, and to the effect stated in said bill. And these defendants further state, that thereafterwards, to wit, on the 4th day of July, A. D. 1829, they made and delivered to said complainant, a deed of assignment of all their property in trust, for the benefit of their creditors, by which deed, all the right of these defendants, being one half, in and to said contract, and to the profits therefrom derived and to be derived, and to the ma-chinery therein mentioned, passed and was conveyed to said complainant. These defendants further state, that as agents of said complainant, or in their own right, or in any otherwise, they never sold to said Almy, nor to said R. G. Hazard & Co. nor to any other person or persons, their interest in said contract, nor as agents of said complainant, nor in their own right, nor in any otherwise, authorized said R. G. Hazard, to sell said interest to said Almy, or to any other person or persons; and, that the right and interest of these defendants, in and to said contract, which by said deed of assignment, passed and was conveyed to said complainant, have never been, to the knowledge or belief of these defendants, conveyed by said complainant, or by any one for him, to any person or persons whatever. These defendants further state, that said R. G. Hazard & Co., sometime in the winter or spring of 1831, proposed to buy the interest of these defendants in said contract, and to give therefor twenty-seven hundred dollars, to be secured by their notes, endorsed by Thomas R. Hazard, also to pay the balance due from said R. G. Hazard & Co. to the complainant as assignee of these defendants, and also that the said R. G. Hazard & Co. pay the balance due the complainant, as assignee of said Charles Low, on a final settlement of all the accounts between said Low and Fenner and R. G. Hazard & Co.; and these defendants, thereupon, agreed to sell their half of said contract to said R. G. Hazard & Co. upon the condition, that all the above terms were previously complied with: the said R. G. Hazard & Co. being then indebted in a large sum to said Low and Fenner, and said Charles Low, but on investigating the accounts, to ascertain the balance due said Low and Fenner and Charles Low, from said R. G. Hazard & Co., said parties were not able to agree upon the balance due said Charles Low, nor did the said R. G. Hazard & Co. pay or assume to pay any part of said twenty-seven hundred dollars, and the negotiation for the sale was broken off, and entirely failed. Nor have the said R. G. Hazard & Co., at any time since, proposed to renew said negotiation, nor have they since paid or offered to pay, any part of the said twenty-seven hundred dollars, nor have they, to the knowledge of these defendants ever pretended, that they had bought the interest of said defendants in said contract, or set up any title thereto. And the accounts between the said R. G. Hazard & Co. and said Low and Fenner, and between said R. G. Hazard & Co. and said Charles Low, remain to this day unsettled, and the balance due said Low and Fenner, and said Charles Low, from said R. G. Hazard & Co., unascertained and unpaid. And these defendants further state, that they considered the sum of twenty-seven hundred dollars, offered by said R. G. Hazard & Co. as less by one thousand dollars or more, than the fair value of their interest in

said contract; but they were willing to take that sum, together with a compliance by said R. G. Hazard & Co. with the other terms offered, in order to make a final close of the business, and of their concerns with R. G. Hazard & Co. And these defendants further answering, state that from the time said Almy began to furnish said Lippitt with cotton under said contract, to the time of the plaintiff's exhibiting his bill of complaint, they have, at different intervals, repeatedly conversed with said Almy in relation to their interest in said contract, in which conversations they always asserted their right to one half of said contract, and offered to said Almy to furnish the cotton under said contract, and told said Almy, they should claim at his hands, one half of the profits, by him received from supplying the cotton under said contract, nor did they, in any conversation with said Almy, or in his presence or elsewhere, deny, that they owned one half of said contract. And the said Charles Low, answering for himself, denies that the said Rowland G. Hazard was authorized by him, as assignee of said Rowland G. Hazard & Co., to sell to said Almy their (the said R. G. Hazard & Co's.) interest in said contract; and the said Charles Low, further answering for himself, states, he was informed by said Rowland G. Hazard, while said Almy was furnishing cotton under said contract, that he, Almy, did not claim but one half of the contract, and would pay Low and Fenner their half of the profits under the same. And these defendants further state, that when they called on said Almy for an account of said profits, and for payment of one half of the same, said Almy refused to render any account of said profits, or to pay over any part thereof, alleging as his excuse for such refusal, that he did not know who owned the other half of said contract.

Mr. Pratt and R. W. Greene, for plaintiff.
Tillinghast & Whipple, for defendants.

STORY, Circuit Justice. The title of the plaintiff is under an assignment made to him by Low & Fenner, dated the 6th of July, 1829, and erroneously stated in the bill to be on the 4th of July, 1829. That assignment conveys to the plaintiff "All the goods, wares, merchandises, and personal property of every kind, belonging to the said late company of Low & Fenner; and also all notes, book accounts, and debts of every kind due them." Now the supposed interest of Low & Fenner, under Hazard & Company, in the Lippitt contract, stated in the pleadings, is neither a note, nor a book account, nor a debt due; and consequently, it did not pass to the plaintiff under the assignment, unless it can be comprehended under the words "personal property of every kind." These words might possibly have been construed to embrace this equitable sub-interest of Low & Fenner in

the Lippitt contract, if the words had stood alone. But in the connection in which they stand in the assignment, they are manifestly used to signify visible, tangible property, ejusdem generis as goods, wares, and merchandises. For if they were designed to embrace every description of personal property in the broadest sense of the terms, the subsequent clause respecting notes, book accounts, and debts, would not only have been superfluous, but impertinent. My opinion, therefore, is, that the words personal property are used in the assignment in a restrained sense, and do not embrace the equitable interest asserted by Low & Fenner in the Lippitt contract. The plaintiff's title, therefore, wholly fails at the threshold of the cause. The answer of Low & Fenner does not help the case in this respect; for it only admits the assignment, as it stands, and pretends to no other or larger conveyance of their interest, than the terms of the assignment purport to convey. But, although my opinion is thus against the plaintiff on this point, I should be sorry to decide the cause against him solely upon this ground; and I shall, therefore, proceed to the consideration of the other grounds of objection stated in the argument.

The first question is, whether any assignment was in fact made by Hazard & Co. of an interest in the Lippitt contract to Low & Fenner, as stated in the bill. It is certain, that no assignment was made in writing. The bill itself does not directly and positively set up any written contract of assignment signed by the parties. It is true, that there is an unsigned paper appended to the bill; but it is not referred to in the bill as the very contract; nor does the bill assert, that a written contract was intended, and omitted to be signed by the parties by mistake; nor does it ask relief on that account. The bill is not, then, framed for such an aspect of the case; and if it had been, Hazard & Co. must have been made parties to correct the mistake. The bill, indeed, seems indirectly to rely upon some written contract from Hazard & Co. to Low & Fenner, after the 7th of March, 1828, for it asserts an agreement to have been "made and executed," which terms rather lead to the conclusion, that the plaintiff intended to speak of some writing executed. But if this difficulty in the frame of the bill, as founded upon a written contract, can be gotten over, still there remains another difficulty, that there is no proof of any such written agreement, as is averred in the bill, either signed or unsigned. The unsigned written paper annexed to the bill, if it could be construed to import a final executed contract, varies essentially in its terms and provisions from that asserted in the bill. So that the proof totally fails, as well as the allegations, in the bill, if construed to refer to a written contract. If, on the other hand, the bill is to be treated as founded upon a parol contract of assignment, the evidence of what that

contract was, in terms or in purport, is so loose, indeterminate, and unsatisfactory, that it would be impossible to act upon it with any approximation to certainty. I am satisfied, that there was some sort of contract on this subject between Hazard & Co. and Low & Fenner. The weight of evidence clearly establishes that fact. The exception subsequently inserted in the written assignment by Hazard & Co. to Almy, refers to some such contract. But the terms or stipulations of that contract nowhere appear with any reasonable precision. All the evidence respecting it carries us no farther than to the palpable obscure, per ignotum ad ignotius.

I agree, that a contract of this nature might be established by the assent and admission of both the assignors and assignees, by their answers to the bill, if they were parties to it, even though Almy and Lippitt were ignorant of it, and each asserted his ignorance in his answer to the bill. Ryan v. Anderson, 3 Madd. 174, seems sufficiently to prove that, even if upon principle it would admit of doubt. But there is no such admission in this case by the assignors and assignees. Perhaps, too, an assignment of an equitable interest in the Lippitt contract might be good, though made by parol, at least if it did not include a stipulation for the personal services of Hazard & Co. The case of Heath v. Hall, 4 Taunt. 326, is a strong authority to support it; though I desire to be understood as not giving any absolute opinion on the point. The difficulty lies in the proof de facto of any determinate parol contract whatever between Hazard & Co. and Low & Fenner. There is no just ground to call upon a court of equity to enforce a specific performance of a contract between the original parties themselves, where its terms are not clear, definite and positive. A fortiori, there is still more difficulty in enforcing it against an assignee of the party, against whom the specific performance is sought. Besides. it is abundantly proved, that Low & Fenner have, on various occasions, denied, that there was any such contract of assignment between them and Hazard & Co., or that they had any interest in the Lippitt contract. But if the existence of such a contract of assignment to Low & Fenner were completely established in proof, it would be difficult for them, or for the plaintiff, as their assignee, now to demand a specific performance of it, or to assert any rights acquired under it, under existing circumstances. A party, to entitle himself to a specific performance of a contract of this sort, after such a lapse of time, should show, that he had been always ready to perform his part of it. Now, Low & Fenner have not shown, that they were ready to perform the contract, as they state it, at all times. before the failure of Hazard & Co., as well as after. They have never supplied, or offered to supply the cotton for the mill to Lippitt. They have never assisted or offered to assist Almy in supplying it. They come now, long after the period for the due supply has passed, and ask for relief, against their own laches and default. Surely they ought not now to be permitted to turn round, and demand of Almy to be let in to the benefits of a contract, which they have expressly repudiated, by denying, in his presence and otherwise that they had any interest therein; and, without bearing any of the hazards of the supply, now to insist upon sharing the profits. Besides, I am not satisfied, that the assignment to Almy of the contract of Hazard & Co. with Lippitt was not made with the full assent of Low, one of the partners of Low & Fenner; and if it was made with his assent, then it bound the firm. That assignment contains the following clause, to which I have already alluded: "It is further agreed, that if Low & Fenner should redeem their one half of the aforesaid contract by the payment of the drafts drawn on them by R. Hazard & Co. on account thereof, to return half of the aforesaid $5000 to said S. Almy, he relinquishing to said Low & Fenner all claim upon the aforesaid one half of the said contract." Now, when was this redemption by the payment of the drafts to be made by Low & Fenner? Certainly not at an indefinite period. It must have been contemplated by the parties, that it was to be immediately done, or at least within a reasonable time. If Low & Fenner meant to derive any benefit from the clause, it was their duty to proceed forthwith to pay and take up these drafts. They took no steps for this purpose, until years afterwards; and they must, therefore, be deemed to have waived any rights to be derived therefrom. Indeed, there is no proof, that they ever undertook to act upon any such claim, until a very recent period. The claim, which they now assert through their assignee (the plaintiff) is in effect, to take from Almy half the profits of the Lippitt contract, as it has turned out in the event beneficial, without having incurred any risk whatsoever, or even having enabled Almy to make any demand upon them for any loss, or for any fulfilment of the supposed obligation on their side. There is no reciprocity in the case. They have never entered into any contract with Almy to supply any share of the cotton, or to advance any money towards the completion of the Lippitt contract. Under such circumstances, there is as little equity in this claim of Low & Fenner, as can well be imagined. Indeed, they now press a further claim; and insist upon having the other half profits applied towards the payment of the debt of Lippitt for the machinery of the mill. Upon the actual frame of the bill, there is no pretence for this claim; and in this stage of the cause it is too late to ask for an amendment of it. The proceedings have passed the stage, in which they are amendable.

As to the supposed settlement of the claim of Low & Fenner in the Lippitt contract by

Hazard & Co. for the sum of $2700, it is sufficient to say, that it is not made out in point of proof. There were preliminary negotiations on the subject; but they never appear to have resulted in a consummated contract.

But there is an objection to the title of the plaintiff of a more general nature, and which is fatal to it, in whatever form it could be presented. The contract with Lippitt was made on the 7th of March, 1828, and it was to expire in two years, that is to say, on the 7th of March, 1830. The assignment to Almy of that contract did not take place until the 9th of March, 1830, after the term had expired, for which it was to operate. The suit, then, is not maintainable against Almy for any future profits, unless the contract was renewed by Lippitt with Almy, for the benefit of Low & Fenner, as well as himself. There is not the slightest proof of the renewal of the contract for any such purpose; or, indeed, for any purpose. Nor is there the slightest proof, that Almy ever agreed to pay over to Low & Fenner one half of the profits, which he might obtain by continuing to supply Lippitt upon the terms of the old contract. Lippitt himself utterly denies, that he ever had any knowledge of any contract with Low & Fenner, on the subject at any time; so that he never could have agreed to any. The right reserved, under the original contract between Hazard & Co. with Lippitt, to continue the contract after the expiration of the two years, was a right not reserved to either party, but to Lippitt alone. He was not bound to continue it; and there is no proof, that he intended to continue it. The contract of Lippitt with Almy must be treated as a new contract between them, for it totally dispensed with the personal services of Hazard & Co. And Low & Fenner have not shown any original or derivative title to partake of the benefits or share the losses under that contract.

I have gone over the matters in the present bill farther than was necessary to decide it, from an anxiety to show, that in every view, which I have taken of the case, the plaintiff has no merits. But I desire to be understood as resting my opinion mainly on these three grounds: First, the assignment to the plaintiff, Kendall, does not convey any title to the Lippitt contract, even if Low & Fenner had an interest in it; for the terms of that assignment do not embrace such an interest. Secondly, the contract, as set up in the bill, whether verbal or in writing, is not proved. Thirdly, the original contract with Lippitt expired before the assignment to Almy, and therefore Low & Fenner could claim no title except under a new contract, to which they were parties, and by which they were bound. They have shown no such title. The bill is, therefore, dismissed, with costs.